UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS O'KEEFE,<br><br>                      Plaintiff,<br><br>      vs.<br><br>OGILVY & MATHER WORLDWIDE, INC.,<br>DIGITAS, INC. AND AMERICAN EXPRESS<br>COMPANY,<br><br>                    Defendants. | Case No.: 06CV6278 (SHS)<br>**ECF CASE**<br><br>**COMPLAINT FOR<br>COPYRIGHT<br>INFRINGEMENT,<br>TRADEMARK<br>INFRINGEMENT AND<br>MISAPPROPRIATION**<br><br>Jury Trial Demanded |

Plaintiff Thomas O'Keefe, by his counsel Friedman Law Group, LLP and Newberg & Winters LLP, alleges for his complaint against Ogilvy & Mather Worldwide, Inc., Digitas, Inc. and American Express Company, as follows:

## NATURE OF THE ACTION

1.    Plaintiff files this action seeking relief as a result of the willful infringement of Plaintiff's common law trademark rights, federal copyright rights and the misappropriation of Plaintiff's advertising campaign by defendants Ogilvy & Mather Worldwide, Inc. ("Ogilvy"), Digitas, Inc. ("Digitas") and American Express Company ("AmEx") (collectively "Defendants"). Defendants have acted in willful disregard of Plaintiff's intellectual property rights. As Defendants have caused and continue to cause Plaintiff serious and irreparable injury, Plaintiff has no choice but to file this lawsuit.

2.    Thomas O'Keefe ("O'Keefe") is a freelance advertising designer and art director who markets his services at the website www.mycardmywork.com. He registered that address and has operated a website there since May of 2003. O'Keefe has continually used the trade name "My Card, My Work" since approximately February, 2003 and has marketed his services

via the My Card, My Work website continually since registering the domain name in May 2003. Immediately after registering his site, O'Keefe designed the site in a very particular way to show his clients the type of advertising campaign he could develop as well as the outstanding creativity he brought to his clients.  In addition to using the trademark "My Card, My Work" as a theme to the entire website design, O'Keefe added unique elements to the design to set his work apart from others in the field including, among other elements, the use of a personalized handwriting style and personalized arrows.  The unique expression of those elements gives the viewer of the work an overall feeling that he or she is getting a tour of someone's life and not just being sold a product.

3.      In late 2003, O'Keefe sent his résumé and work, including all of his material, ideas and expression from the My Card, My Work website to both Ogilvy and Digitas to seek possible retention as an advertising designer or art director.  His agent also sent O'Keefe's work to Digitas separately.

4.      In mid to late 2004, more than a year after O'Keefe designed and launched his "My Card, My Work" campaign, AmEx, with the help of its advertising agencies Ogilvy and Digitas launched AmEx's "My Life, My Card" campaign.  Upon information and belief, since launching that campaign, AmEx has spent hundreds of millions of dollars promoting the American Express credit card and other AmEx services through this campaign.  Upon information and belief, Ogilvy and Digitas have also reaped millions in revenues based on their work with AmEx on the "My Life, My Card" campaign.  In addition to the troubling nature of the similarities between O'Keefe's trademark and the mark used by AmEx, AmEx's advertisements for its campaign, especially its print and website marketing, appear to be wholesale copies of the copyrightable elements of O'Keefe's designs.

5.      Defendants have thereby misappropriated O'Keefe's advertising campaign, willfully infringed Plaintiff's copyrights, infringed Plaintiff's trademark, and unfairly competed with Plaintiff in the advertising field.  The hundreds of millions of dollars AmEx has spent on its infringing campaign have created reverse trademark confusion among O'Keefe's actual and potential clients.  There has indeed been actual confusion among consumers between O'Keefe's work and trademark and the AmEx campaign.  O'Keefe has lost some clients and potential clients and has had to enter into embarrassing discussions with others, all of whom have assumed that he copied AmEx's advertising campaign as opposed to the other way around.  This has been very harmful to his reputation in the advertising community.  Plaintiff therefore seeks injunctive and declaratory relief and damages for Defendants' willful and unlawful actions.

## JURISDICTION AND VENUE

6.      This is a civil action seeking declaratory, injunctive, and monetary relief for infringement under the copyright laws of the United States (17 U.S.C. § 101 *et seq.*) and violation of the Lanham Act (15 U.S.C. § 1051 *et seq.*).  The Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, and 1338(a) and (b).

7.      The court also has jurisdiction over the state law and common law claims in this case under 28 U.S.C. § 1367 as they rely on the same or related facts as Plaintiff's federal copyright claim and Lanham Act claims.

8.      The Court has personal jurisdiction over Defendants because Defendants AmEx (which is also incorporated in this state) and Ogilvy have their principal place of business in this state and District and Defendant Digitas offers a significant amount of services to residents of this state and this District and has offices in this state and District.  All of the Defendants are

present in and doing business in this state and this District and are causing harm to Plaintiff in this state and this District.

9.      Venue is properly laid in this District pursuant to 28 U.S.C. §§ 1391 (b) and (c), and 1400 (a).

## PARTIES

10.      Plaintiff THOMAS O'KEEFE is an individual residing at 140 Winter Street in Bridgewater, Massachusetts.

11.      Defendant OGILVY & MATHER WORLDWIDE, INC., under information and belief is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York.  Upon information and belief, Ogilvy is a fully owned subsidiary of the London corporation WPP Group plc.

12.      Defendant AMERICAN EXPRESS COMPANY, under information and belief is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York.

13.      Defendant DIGITAS, INC., under information and belief is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Boston, Massachusetts, and with offices in New York, New York.

14.      Plaintiff is engaged in the business of advertising, including print and web media advertising.  He markets his services as a freelance advertising designer through various methods and uses the trademark "My Card, My Work" as an identifier for his services.  He also markets his services on his website www.mycardmywork.com where some of his work as well as his résumé can be found.  He holds a United States Copyright (#VA 1-351-680) in the compilation of elements on his website and web pages as well as the text found there.

15.    Defendant AMERICAN EXPRESS COMPANY is one of the largest and most well-known corporations in the world.  Upon information and belief, it markets a plethora of financial services, including, most famously, the American Express Credit Card.  In 2004, it started a campaign to market that credit card with the tag line "My Life, My Card."  Since the start of that campaign, AmEx has attempted to use "My Life, My Card" as a trademark.

16.    Upon information and belief, Defendant OGILVY & MATHER WORLDWIDE, INC. is a major advertising agency which holds many of the largest companies in the United States, if not the world, as its clients.  Upon information and belief, Ogilvy often develops large advertising campaigns for its clients stretching over television, print media, Internet-based media (including websites), and other forms of media.  Upon information and belief, AmEx is a client of Ogilvy and Ogilvy developed or played a key role in developing the My Life, My Card campaign for AmEx.

17.    Upon information and belief, DIGITAS, INC. is an advertising and consulting company that also holds many large corporations as its clients.  Upon information and belief, some of the services Digitas performs for its clients include developing their clients' websites to coordinate with each client's current or upcoming advertising campaign.  Upon information and belief, AmEx is a client of Digitas (whether directly or indirectly through a relationship with Ogilvy) and Digitas developed or played a key role in developing aspects of the My Life, My Card campaign for AmEx, including the development of web media and/or websites for AmEx.

## PLAINTIFF'S COPYRIGHTED WEBSITE/WEB PAGES

18.    Plaintiff is the copyright owner of the visual art compilation found on the webpages on the Internet under the domain name www.mycardmywork.com.  Plaintiff's copyrighted work consists of the type found on those webpages as well as the selection,

5

coordination and arrangement of materials in such a way that the resulting work as a whole constitutes an original work of authorship. *See* 17 U.S.C. § 101. The arrangement of these materials, including the arrangement of personalized handwriting and arrows that appear hand-drawn on top of material that would otherwise be considered impersonal creates a unique expression. The totality of this expression gives the viewer of the work an overall feeling that there is actually a person making notes, jotting down thoughts, etc. to personalize the items on the website and make the viewer feel that she is getting a tour of someone's life and not just being sold a product.

19.     As opposed to simply having the idea of making something impersonal seem personal, Plaintiff spent a significant amount of time and energy coming up with just the right expression, an expression that gives his work a very specific and unique feel. Copies of Plaintiff's copyrighted work can be found at Ex. 1 to this Complaint.

## PLAINTIFF'S TRADEMARK AND TRADE DRESS

20.     Plaintiff works as a freelance advertising designer and has worked in the advertising field since 1994. Since approximately February of 2003, Plaintiff has used the trademark "My Card, My Work" as an identifier for himself as an advertiser and his work. To further the marketing and identification of "My Card, My Work" as a trademark, Plaintiff launched a website, www.mycardmywork.com, the domain name of which was registered on May 28, 2003.

21.     Plaintiff has been using "My Card, My Work" as a trademark continuously since the launch of his website in May 2003. It is the only website he operates to identify his business and all or substantially all of his clients recognize My Card, My Work and the mycardmywork.com website as representing and identifying Thomas O'Keefe.

22.     Plaintiff's work found on the mycardmywork.com website has been recognized on the Internet by various organizations, groups and individuals for its superior workmanship. All of these entities have come to associate the My Card, My Work trademark and website as identifying the work of O'Keefe.

23.     As an individual, Plaintiff does not have millions of dollars to spend on the advertising of his work and trademark.  However, Plaintiff does spend thousands of dollars each year marketing himself to potential clients and employers through the My Card, My Work trademark and the mycardmywork.com website.  Plaintiff also directs potential clients to his website via methods of advertising such as business cards, Internet advertising and word of mouth.  Since the launch of his trademark and website, Plaintiff has developed many clients for his advertising work.  The My Card, My Work trademark and website, in conjunction with the quality of Plaintiff's work, have allowed him to obtain a healthy income from such clients.

24.     Plaintiff has established considerable and valuable trademark rights and goodwill in his My Card, My Work trademark by virtue of his long and continuous use of that mark, promotional and marketing efforts, advertising and promotional expenditures, significant and important clientele, strong revenues in connection with the mark, and third-party acclaim and attention.

25.     Plaintiff's My Card, My Work mark is inherently distinctive and serves as an identifier for Plaintiff and his products and services.

**PLAINTIFF'S DEVELOPMENT OF AN ADVERTISING CAMPAIGN**

26.     In addition to serving to strengthen the My Card, My Work trademark, the My Card, My Work website contains work that has significant copyrightable elements.  Plaintiff has therefore registered the Copyright in that work.  In addition, Plaintiff created the work on his

website to operate as a sample advertising campaign—in this case, advertising himself and his services—to show the type of original and thought-provoking expression he could create for his clients.

27.     The copyrightable elements of this advertising campaign are comprised of various materials, including the arrangement of personalized handwriting and arrows that appear hand-drawn.  In this case, the web pages lay out an advertising campaign which starts with what would otherwise be an impersonal glance into the life of a person through the display of his business card and the business cards of those companies with which he has done business.  However, the addition of various elements, including a personalized and stylized handwriting with large seemingly hand-written arrows pointing to items such as "My Card" and "My Work" make the viewer feel as if he is being given a tour of the real person beyond the impersonal artifacts, a journey into the person's day-to-day life.

**PLAINTIFF'S COMMUNICATION OF HIS WORK TO DEFENDANTS**

28.     In the summer of 2003, Plaintiff endeavored to obtain employment with some of the largest advertising agencies in Boston and New York City.

29.     As part of that attempt, Plaintiff sent his résumé, along with all of his work from the mycardmywork.com website to a number of different companies, including many of those large agencies.

30.     Among the agencies to which Plaintiff sent his work in the Summer of 2003 were Ogilvy in New York and Digitas in Boston.

31.     In addition to Plaintiff sending his résumé and work to those companies, Plaintiff employed an agent to assist him in finding work with major advertising agencies and related

entities.  That agent sent O'Keefe's résumé as well as his work from the mycardmywork.com website to Digitas in Boston.

### THE DEVELOPMENT OF THE AMERICAN EXPRESS CAMPAIGN

32.     Upon information and belief, AmEx is a long-time customer of Ogilvy.  Upon information and belief, in 2004, AmEx was interested in developing a new campaign to market all of its financial services, especially its line of American Express credit cards.  Upon information and belief, AmEx hired Ogilvy to come up with and implement such an advertising campaign, including a slogan/tag line.

33.     Upon information and belief, AmEx also hired Digitas to come up with and implement parts of its advertising campaign, either directly or indirectly through Ogilvy.  Upon information and belief, one of Digitas's primary responsibilities was Internet media, including the implementation of the campaign on AmEx's existing websites and the creation of new websites related to the campaign.

34.     Upon information and belief, Ogilvy and Digitas introduced the My Life, My Card campaign for AmEx in late 2004.

35.     The My Life, My Card campaign consists of elements that have been completely copied from and are substantially similar to the elements of O'Keefe's advertising campaign and copyrighted work.  The use of the mark "My Life, My Card" is obviously also substantially and confusingly similar to O'Keefe's trademark of "My Card, My Work."

36.     Upon information and belief, AmEx has spent hundreds of millions of dollars in advertising the My Life, My Card campaign including a massive amount of television ads, print ads, billboards, radio ads, and Internet media ads, among others.

37.     Substantially similar to O'Keefe's campaign and copyrighted work, The My Life, My Card advertisements and marketing serve to form a personal connection between the American Express credit card and its users by offering a glimpse into the personal lives of famous people who also happen to be American Express credit card holders.

38.     For example, many of the Print advertisements, found in a plethora of nationally-recognized magazines, each focus on an individual celebrity who lists, again in a very stylized personalized handwriting, personal aspects of their lives such as their dreams, their fears, and their favorite places, always finishing with the answer to the question "My card:"  "American Express."  In each such advertisement, there is the tagline at the bottom (in the same handwriting for each advertisement, as opposed to the individualized "handwriting" of the celebrity): "My Life, My Card."

39.     On many of AmEx's web pages, advertisements similar to the Print advertisements can be found, again focusing on the celebrity's personal lives to make the consumer feel a deeper connection with the credit card.  In addition, some of the web pages are more interactive, allowing the viewer to explore a deeper connection with the celebrity and the credit card.  These web pages take wholesale many of the characteristics of O'Keefe's web pages and advertising campaign.

40.     By way of example, Ex. 2 to the Complaint shows many, if not all, of the AmEx web pages associated with one of AmEx's spokespeople, Ellen Degeneres.  On these pages, the mark "My life. My card." is prominently displayed next to the signature of Ellen Degeneres.  In addition, the words "My Life" are displayed again, larger on the page in a stylized and personalized handwriting with an arrow drawn from those words to a woman's bag or purse, filled with items supposedly belonging to Ellen Degeneres.  The words "My Card" are written in

a similar manner below the words "My Life," only with another arrow drawn, pointing towards a box that one can click on to obtain an American Express credit card.

41.    Clicking on any of the items in Ellen's virtual bag on the website brings up more handwriting with more arrows, such as the words "My Journal" with another arrow drawn to an item that is supposedly Ellen's journal.  Clicking on the journal opens Ellen's journal with more handwriting and arrows to represent notes made by Ellen, all giving the viewer a window into Ellen's life through the use of the handwriting and arrows, making the viewer feel more connected to American Express credit cards.

42.    Even a brief comparison between O'Keefe's work at Ex. 1 and the AmEx pages at Ex. 2, shown just as one example, reveals a substantial similarity between the two, and reveals the wholesale copying of O'Keefe's advertising campaign that he sent to Ogilvy and Digitas over a year before the development of the AmEx campaign.

43.    Upon information and belief, the My Life, My Card campaign has been a huge financial and critical success for AmEx, directly related to a large spike in AmEx's revenues. Ogilvy, because of its work for AmEx, including this campaign, was even awarded a "Grand ADDY," at the 2005 ADDY awards (advertising's version of the Academy Awards), the organization's highest honor, only given out once before in the award ceremony's history.

44.    Upon information and belief, the My Life, My Card campaign is still ongoing, with AmEx spending millions of dollars monthly across all forms of media.

45.    Since at least 2003, O'Keefe's clients have all identified him through the trademark My Card, My Work and the corresponding website.  In addition to the mark "My Card, My Work," they have also identified him through his sample advertising campaign that can be found at his website, which has been misappropriated by Defendants.

46.     O'Keefe has been overwhelmed in the marketplace through the hundreds of millions of dollars AmEx has spent promoting its My Life, My Card campaign.

47.     Various clients and potential clients have accused O'Keefe of copying AmEx's trademark even though his trademark was established well before AmEx's campaign.  Various clients and potential clients have accused O'Keefe of copying AmEx's advertising campaign even though his copyrighted work and sample advertising campaign were published over a year before AmEx started its campaign.

48.     Defendants' actions are likely to cause reverse confusion in that the saturation of the marketplace with the AmEx campaign has caused and likely will cause consumers to erroneously believe that O'Keefe's services emanate from, are sponsored by, are somehow connected to, or infringe on the rights of Defendants.

49.     O'Keefe has lost clients and potential clients because of this reverse confusion over his trademark as well as the mistaken belief that he, rather than Defendants, is guilty of copyright infringement and misappropriation.  Additionally, O'Keefe's relationships with his clients and potential clients have been put in awkward and damaging situations as O'Keefe has had to explain and defend his innocence to those clients and potential clients.

50.     Defendants' use of the O'Keefe trademark in their advertising campaign is likely to cause confusion or mistake among consumers, and to deceive them into thinking that O'Keefe is affiliated, connected, and/or associated with Defendants and/or deceive them into thinking that O'Keefe is infringing upon the intellectual property rights of Defendants, causing him great harm.  Among other things, O'Keefe is likely to suffer a loss of goodwill associated with his trademark from such confusion.

51.     On information and belief, Defendants have profited from their wrongful conduct, including, without limitation, the millions of dollars Ogilvy and Digitas have received from AmEx for the development of an advertising campaign and the additional clients they have gained through the media exposure of that campaign, and the hundreds of millions of dollars AmEx has received by virtue of its infringement of O'Keefe's intellectual property rights through use of the My Life, My Card advertising campaign and the confusingly similar "My Life, My Card" mark.

### PLAINTIFF'S NOTICE TO DEFENDANTS REGARDING ILLEGAL CONDUCT

52.     On April 10, 2006, Plaintiff's counsel sent a letter to each of the Defendants informing them of their infringing and illegal activities and attempting to come to a resolution of the issues presented.  Plaintiff gave Defendants two weeks to respond.

53.     Having heard nothing after two weeks, Plaintiff's counsel sent another letter to each of the Defendants imploring them to respond.

54.     On April 26, 2006 Plaintiff's counsel received very terse letters from Defendants' attorneys simply stating that any claim would be baseless and there was nothing to discuss.

### COUNT I

### (Copyright Infringement)

55.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 54, above.

56.     This claim is brought pursuant to the Copyright Act, seeking declaratory, injunctive and monetary relief.

57.     Under Section 106 of the Copyright Act, each person has the exclusive right to reproduce his copyrighted works, the exclusive right to authorize the reproduction of his copyrighted works, and the exclusive right to create derivative works of his copyrighted works.

58.     Unauthorized reproduction or the creation of an unauthorized derivative work of a copyrighted work constitutes infringement of the exclusive rights under Section 106 of the Copyright Act.  Defendants have willfully, with full knowledge of Plaintiff's copyrights, and without license or authorization, copied, reproduced and distributed O'Keefe's copyrighted works (and derivative works based on O'Keefe's copyrighted works) through the creation, implementation and distribution of the AmEx campaign.  In addition, they have willfully, with full knowledge of Plaintiff's copyrights, and without license or authorization, created derivative works based on Plaintiff's copyrighted work and unlawfully distributed the same.  Through their activities, Defendants have infringed O'Keefe's copyrights, including, but not limited to, O'Keefe's exclusive rights to copy, distribute and create derivative works.

59.     As a direct and proximate result of the foregoing acts of infringement by Defendants, Plaintiff has been and will continue to be irreparably injured.

60.     As a direct and proximate result of the foregoing acts of infringement by Defendants, Plaintiff is entitled to damages under Section 504 of the Copyright Act, including without limitation Defendants' profits from the unauthorized uses of his copyrighted work.

61.     Defendants' conduct, as averred herein, is causing Plaintiff irreparable injury that cannot be adequately compensated or measured in monetary damages and thus should be permanently enjoined.

## COUNT II

### (Reverse Trademark Confusion Under Common Law)

62.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 61, above.

63.     Plaintiff has a common law trademark and service mark in the State of New York in the mark "My Card, My Work."  O'Keefe has used this trademark continuously for over three years to identify his work and services.

64.     Plaintiff has spent a great deal of personal effort, money and time in developing his trademark over the last three and a half years, including the development of his website with the same url Internet address as his mark:  www.mycardmywork.com.  His clients recognize the mark "My Card, My Work" as an identifier and clients and potential clients regularly visit his website of the same name.

65.     Defendants are liable for infringement of Plaintiff's trademark.  Without O'Keefe's consent or authorization, Defendants have used in commerce a reproduction, counterfeit, copy, or colorable or substantially similar imitation of Plaintiff's trademark in connection with the AmEx campaign and the sale of AmEx services and credit card memberships.

66.     Such infringement of the O'Keefe trademark and service mark is likely to cause and has already caused reverse confusion in the marketplace.  Consumers have been deceived and are likely to be deceived into believing that Plaintiff's products and services are affiliated with or infringing upon the services and products of Defendants.

67.     Such actions taken by Defendants are in violation of the law and Plaintiff is entitled to various remedies including injunctive relief, damage to Plaintiff in terms of lost revenue and profits and the damage to his trademark and goodwill of said trademark, Defendants' profits obtained due to the unauthorized use of O'Keefe's trademark, and an award of corrective advertising.

68.    Defendants' conduct, as averred herein, is causing Plaintiff irreparable injury that cannot be adequately compensated or measured in monetary damages and thus should be permanently enjoined.

## COUNT III
### (False Designation of Origin under Section 43(a) of the Lanham Act)
### (15 U.S.C. § 1125(a)(1))

69.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 68, above.

70.    Defendants' use in commerce of an infringement of Plaintiff's common law trademark is likely to cause confusion or to cause mistake or to deceive consumers as to the affiliation, connection or association of Defendants with Plaintiff.

71.    The resulting confusion and reverse confusion of Defendants' use in commerce of these infringing marks has made and is likely to make others believe that Plaintiff is connected with Defendants or that Plaintiff has infringed upon Defendants works and marks as opposed to the other way around, thereby harming Plaintiff and the public.

72.    Such actions taken by Defendants are in violation of the law and Plaintiff is entitled to various remedies including injunctive relief, damage to Plaintiff in terms of his lost revenues and profits, the damage to his business's and trademark's goodwill, Defendants' profits due to the unauthorized use of O'Keefe's trademark, and an award of corrective advertising.

73.    Defendants' conduct, as averred herein, is causing Plaintiff irreparable injury that cannot be adequately compensated or measured in monetary damages and thus should be permanently enjoined.

## COUNT IV

## (State and Common Law Unfair Competition)

74.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 73, above.

75.     Defendants' actions constitute common law unfair competition and misappropriation of Plaintiff's goodwill in his marks and business under New York state law and common law.

76.     Such actions taken by Defendants are in violation of the law and Plaintiff is entitled to various remedies including injunctive relief, damage to Plaintiff in terms of his lost revenues and profits, the damage to his business's and trademark's goodwill, Defendants' profits due to the unauthorized use of O'Keefe's trademark, and an award of corrective advertising.

77.     Defendants' conduct, as averred herein, is causing Plaintiff irreparable injury that cannot be adequately compensated or measured in monetary damages and thus should be permanently enjoined.

## **COUNT V**

### **(Misappropriation)**

78.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 77, above.

79.     The idea for an advertising campaign conveyed to Defendants by Plaintiff was novel and original and was unknown to Defendants before Plaintiff conveyed said idea.  In addition, Plaintiff's idea was a valuable property right to Plaintiff.

80.     Defendants' misappropriation of that idea without payment to Plaintiff was unlawful under New York state and common law.

81.     Plaintiff is entitled to various remedies including injunctive relief, damage to Plaintiff in terms of his lost revenues and profits, the damage to his business's goodwill, Defendants' profits due to the unauthorized misappropriation, and an award of corrective advertising, equal to the amount Defendants have spent on the advertising and marketing of the AmEx campaign.

82.     Defendant's conduct, as averred herein, is causing Plaintiff irreparable injury that cannot be adequately compensated or measured in monetary damages.

## COUNT VI

### (Breach of Implied Contract)

83.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 82, above.

84.     It is well-known in the advertising world that when ideas are submitted to advertising agencies for advertising campaigns, those ideas and campaigns will not be used by the advertising agency and its clients without compensation for such use.

85.     As large advertising agencies and one of the largest companies in the world, Defendants were aware of this.

86.     By taking Plaintiff's idea for an advertising campaign and using it as or in their own campaign, Defendants entered into an implied contract with Plaintiff to pay him for his work and services.  Plaintiff has not been paid by any of the Defendants for his work and services and is entitled to a reasonable fee for his work and services, including without limitation the idea for the AmEx campaign.  That amount should reflect a reasonable royalty, based upon damage to Plaintiff in terms of his lost revenues and profits, the damage to his business's goodwill, Defendants' profits, and/or an award of corrective advertising.

## COUNT VII

### (Unjust Enrichment)

87.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 86, above.

88.     Defendants have obtained a substantial monetary gain at Plaintiff's expense. Plaintiff spent a considerable amount of time and effort developing the idea for his advertising campaign.  Plaintiff has lost business and has had customers and potential customers assume that

he copied AmEx's advertising campaign as opposed to the other way around.  Meanwhile, the Defendants have received millions of dollars through their unlawful and unethical actions as described in this Complaint.  Under such a scenario, it would be entirely inequitable to allow Defendants to keep such ill-gotten gains without paying Plaintiff.

89.     Plaintiff is therefore entitled to various remedies including injunctive relief, damage to Plaintiff in terms of his lost revenues and profits, the damage to his business's goodwill, Defendants' profits, and an award of corrective advertising, equal to the amount Defendants have spent on the advertising and marketing of the AmEx campaign.

## **RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.     For a declaration that Defendants have willfully infringed the copyrights of Plaintiff during the creation, implementation and distribution of advertisements related to the AmEx campaign;

B.     For a permanent injunction requiring Defendants, its agents, employees, and other persons acting in concert with, or for, them (i) to cease and desist implementation and distribution of any advertisements or marketing related to AmEx's "My Life, My Card" campaign; (ii) to cease and desist the use in commerce of Plaintiff's trademarks and service marks or any marks confusingly similar to Plaintiff's marks, including ceasing and desisting use of the mark "My Life, My Card"; (iii) to cease and desist from making any infringing reproductions of Plaintiff's copyrighted works; (iv) to destroy any advertising, marketing materials or other materials in the possession of Defendants which infringe upon Plaintiff's trademarks or service marks, including without limitation any infringing reproductions on Defendants' computer servers; and (v) to destroy any infringing reproductions of Plaintiff's

copyrighted works in the possession of Defendants, including without limitation any infringing reproductions on Defendants' computer servers;

C.      An Order requiring Defendants to disseminate corrective advertising to address the actual and likely confusion that it has caused through its unlawful activities;

D.      For an award of actual damages in an amount to be proven at trial for the Copyright Infringements;

E.      For an award of all of Defendants' profits arising from their unlawful acts, and that such profits be increased and trebled, pursuant to 15 U.S.C. § 1117 and other applicable laws;

F.      For an award of all of Plaintiff's damages, in an amount to be determined, resulting from Defendants unlawful acts, and that such damages be increased and trebled, pursuant to 15 U.S.C. § 1117 and other applicable laws;

G.      For an award of the costs of this action, including reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117 and other applicable laws;

H.      For an award of damages representing an appropriate amount for Defendants' unlawful actions based on Plaintiff's Implied Contract and Unjust Enrichment Claims; and

I.      For such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      August 18, 2006

**FRIEDMAN LAW GROUP LLP**


By: \s\ Aaron Patton
    Gary B. Friedman (GF-2597)
    Tracey Kitzman (TK-5869)
    Aaron Patton (AP-6334)
    155 Spring Street, Fifth Floor
    New York, New York 10012
    Phone:    (212) 680-5150
    Fax:    (212) 219-6446

    Brad R. Newberg
    Christopher Winters
    **Newberg & Winters LLP**
    8300 Boone Boulevard, Suite 500
    Vienna, Virginia 22182
    Phone:    (703) 714-9530
    Fax:    (703) 991-4516

    *Counsel for Plaintiff*