UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                          :

THOMAS O'KEEFE,                     :
                                          :

                    Plaintiff,         :     06-cv-6278 (SHS)
                                          :

        -against-              :     <u>OPINION & ORDER</u>
                                          :

OGILVY & MATHER WORLDWIDE, INC.,  :
DIGITAS, INC., and AMERICAN EXPRESS  :
COMPANY,                         :
                    Defendants.    :
-----------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

       Plaintiff Thomas O'Keefe brings this action for copyright and trademark

infringement and related state-law torts against defendants Ogilvy & Mather Worldwide,

Inc. ("Ogilvy"), Digitas, Inc. ("Digitas"), and the American Express Company ("Amex").

The lawsuit arises out of the well known "My Life. My Card." advertising campaign used

to promote Amex credit cards and other products from 2004 to 2006.  Amex hired

advertising agencies Ogilvy and Digitas to develop the campaign.

       In his complaint, O'Keefe charges defendants with appropriating copyrighted

features of his website—www.mycardmywork.com—for use in the advertising campaign.

In addition, O'Keefe asserts that the "My Life. My Card." tagline creates trademark

confusion with his "My Card. My Work." mark.  O'Keefe also brings state common law

claims of unfair competition, misappropriation, breach of implied contract, and unjust

enrichment.  The Court has previously dismissed O'Keefe's claims of misappropriation

and unjust enrichment against all defendants as well as his claims of trademark

infringement, false designation of origin, and unfair competition against defendants Ogilvy

and Digitas.

Following discovery, defendants now move for summary judgment dismissing the remaining claims: copyright infringement and breach of implied contract against all defendants and trademark infringement, false designation of origin, and unfair competition against Amex.  Plaintiff cross-moves for partial summary judgment as to his claims of trademark infringement and false designation of origin against Amex.[1]  Because there are no genuine issues of material fact and defendants are entitled to judgment as a matter of law, summary judgment is granted to all defendants and plaintiff's motion for partial summary judgment in his favor is denied.

## I.   BACKGROUND

Viewing the evidence in the light most favorable to plaintiff on defendants' motion for summary judgment and resolving all factual disputes in his favor, the following facts are relevant to the present motions.

### A.   "My Card. My Work."

In the spring of 2003, plaintiff Thomas O'Keefe, an art director and graphic designer, received notice from his employer that it was closing the office in which he worked.  (Local Rule 56.1 Statement of Undisputed Facts by Defs. Amex and Ogilvy in Support of Defs.' Mot. for Summary Judgment dated Jan. 14, 2008 ("Defs.' 56.1") ¶ 49; Pl.'s Response to Defs.' 56.1 dated Feb. 4, 2008 ("Pl.'s Counter 56.1") ¶ 49; Decl. of Thomas O'Keefe in Support of Pl.'s Mot. for Partial Summary Judgment dated Jan. 3, 2008 ("O'Keefe Decl.") ¶ 1.)  O'Keefe then went into business for himself providing advertising, branding, and graphic and web design services.  (O'Keefe Decl. ¶¶ 1-3.)

---

[1] Plaintiff also moves to set aside a January 2, 2008 order issued by Magistrate Judge Frank Maas resolving a discovery dispute between the parties going to the issue of damages.  Finally, plaintiff moves to strike the expert report and testimony of marketing professor David Seal.

O'Keefe named his business "My Card. My Work."  (Id. ¶¶ 3-4.)[2]

In relation to his business, O'Keefe uses the phrase "My Card. My Work." in a number of ways.  For example, he uses the email address "look@mycardmywork.com" for work-related emails.  (Id. ¶¶ 17-18.)  When O'Keefe bills his clients or sends proposals for projects, his paperwork contains "My Card. My Work." in the header.  (Id. ¶¶ 20, 26 and Exs. 6, 12.)  When O'Keefe seeks to generate business through various design-related websites and internet message boards, he uses the name "My Card. My Work."  (Id. ¶ 25 and Ex. 11.)  On federal income tax forms, O'Keefe identifies his business as "MYCARDMYWORK."  (Id. ¶¶ 27-28 and Ex. 13.)  In addition, O'Keefe adduced testimony from several of his clients and colleagues that his business is known as "My Card. My Work." and not by any other name.  (See, e.g., Dep. of Jonathan Burns dated Oct. 2, 2007 ("Burns Dep.") at 38; Dep. of David Galper dated Oct. 3, 2007 ("Galper Dep.") at 71; Dep. of Lars Perkins dated Oct. 4, 2007 ("Perkins Dep.") at 10:21-11:2; Dep. of Thomas Mahoney dated Sept. 21, 2007 ("Mahoney Dep.") at 180:3-14; Dep. of Benjamin Cantlon dated Sept. 13, 2007 ("Cantlon Dep.") at 156:2-4; see also Pl.'s Local Rule 56.1 Statement of Facts in Support of Pl.'s Mot. for Partial Summary Judgment dated Jan. 11, 2008 ("Pl.'s 56.1") ¶ 27.)

In support of his business, O'Keefe developed a website that includes his resume and contact information, samples of websites and advertising materials that he created for his clients, and a client list.  (O'Keefe Decl. ¶ 10 & Ex. 2.)  O'Keefe registered the domain name "www.mycardmywork.com" on May 28, 2003 and posted an active version of the

---

[2] In the 1990s, O'Keefe did similar work on a freelance basis under the names "O'Keefe Design & Brand Identity," "O'Keefe Design," and "O'Keefe Design & Branding."  (O'Keefe Decl. ¶ 49.)  Viewing the evidence in the light most favorable to O'Keefe, it appears that he ceased using these names well before 2003, when he adopted "My Card. My Work." as the exclusive name for his business.  (Id. ¶¶ 48-55.)

site later that summer.  (Pl.'s 56.1 ¶¶ 9-10; Response of Defs. Amex and Ogilvy to Pl.'s

56.1 dated Feb. 4, 2008 ("Defs.' Counter 56.1") at 4 ¶ 9; O'Keefe Decl. ¶¶ 9, 11.)  The

pages that make up the www.mycardmywork.com site have not changed since the summer

of 2003.  (O'Keefe Decl. ¶ 10.)

  Visitors to the website are first presented with a page reading:

> my card. my work.
> if you want to continue, this
> site requires the flash6 player
> go
>
> if you've had it up to "here"
> with these silly flash sites and
> want to cut to the chase
> view resume

(Deposition of Thomas O'Keefe dated Sept. 27, 2007 ("O'Keefe Dep.") at 69:18-25;

Defs.' 56.1 ¶ 51; <u>see also</u> http://www.mycardmywork.com/ (last visited Nov. 24, 2008).)

  If a visitor clicks "go," she enters the main area of the site, but if she clicks "view

resume," she is presented with O'Keefe's resume and does not access the main area of the

site.  (O'Keefe Dep. at 69:18-72:11; http://www.mycardmywork.com/ (last visited Nov.

24, 2008).)  The main area of the site is made up of approximately fifteen pages with a

common layout.  Each page consists of a white, horizontally-aligned rectangle with the

words "THOMAS O'KEEFE" and "ART DIRECTOR" along the top border, as well as

navigable links labeled "MY CARD | MY RESUME | MY WORK | MY CLIENT LIST,"

"CLIENT ACCESS," and "DOWNLOAD RESUME" along the bottom border.  (O'Keefe

Decl. Ex. 2.)  Each page has a large space for text and graphic elements in the middle.

(<u>Id.</u>)

  The initial page of the main area of the site prominently displays the text "My

Card" and "My Work" in a font style that simulates handwriting, along with arrows that point away from the text toward graphic elements—namely, a depiction of O'Keefe's business card and a depiction of cards containing the names of some of O'Keefe's clients—that appear to "bleed off the page" (i.e., that are drawn so that portions of the business cards appear to be cut off by the page border).  (Id.; Pl.'s 56.1 ¶¶ 14-15, 65; Defs.' Counter 56.1 at 5 ¶¶ 14-15, 13 ¶ 65.)  O'Keefe refers to the arrangement of text, arrows and graphic elements as a "link[ing]" of the words "My Card. My Work." to "real world objects (rather than drawn objects)."  (Pl.'s Mem. in Opposition to Defs.' Mot. for Summary Judgment dated Feb. 4, 2008 ("Pl.'s Opp. Mem.") at 14.)  The text and arrows do not materialize on the page all at once, but are animated to appear as if being written. (O'Keefe Decl. Ex. 2; Pl.'s 56.1 ¶¶ 14, 64; Defs.' Counter 56.1 at 5 ¶ 14, 13 ¶ 64.)  A user may click on the graphic elements to navigate to other pages on the site.  (O'Keefe Decl. Ex. 2; see also http://www.mycardmywork.com/center.html (last visited Nov. 24, 2008).)

The other pages on the site consist of contact information for O'Keefe, his resume, and samples of work created for his clients—specifically, screen shots of two commercial websites and an image of a billboard.  (O'Keefe Decl. Ex. 2.)  Some of these pages contain animated, seemingly handwritten text and arrows pointing to graphic elements that, as on the initial page, appear to "bleed off the page."  (Id.)  O'Keefe subsequently obtained a registered copyright for the compilation of text and graphic elements displayed on the pages making up the www.mycardmywork.com website.  (Defs.' 56.1 ¶¶ 46-47; Pl.'s Counter 56.1 ¶¶ 46-47; Certificate of Copyright Registration dated Apr. 28, 2006 ("Copyright Registration Certificate"), Ex. 26 to Decl. of Marc J. Rachman in Support of

Defs.' Mot. for Summary Judgment dated Jan. 14, 2008 ("Rachman Decl.").)[3]  O'Keefe

has not sought trademark registration for the phrase "My Card. My Work."

      B.      <u>Defendants' Alleged Access to Plaintiff's Work</u>

      In the summer of 2003, O'Keefe sought to obtain employment with several large

advertising agencies.  (Compl. ¶¶ 28-30.)  Believing that employment applications

submitted to the human resources departments of these agencies would "just . . . get . . .

thrown in a folder if not thrown in [the] trash," O'Keefe instead sought to apply directly to

"creative director[s] or [persons] within . . . creative department[s]."  (O'Keefe Dep. at

187:12-16.)  O'Keefe attempted to contact those persons with an unsolicited email that

introduced him as an experienced art director possessing "key qualifications for a position

you may offer."  (Ex. 16 to O'Keefe Decl. at 1.)  After describing his qualifications, the

email concluded: "Below are links to my teaser site, resume and case studies and samples.

If you have any questions please feel free to contact me."  (<u>Id.</u>)  After O'Keefe's signature

line, the email read:

> Visit my site:
> http://www.MyCardMyWork.com
>
> Download my Resume:
> http://www.MyCardMyWork.com/resume_download.pdf
>
> Case Studies and Samples:

---

[3] O'Keefe initially sought a copyright for a "2-dimensional artwork."  (Copyright Registration Certificate at 1; Fax Transmission from U.S. Copyright Office to Brad E. Newberg dated May 12, 2006 ("Copyright Office Letter"), Ex. 27 to Rachman Decl.; Fax Transmission from Brad E. Newberg to U.S. Copyright Office dated May 15, 2006 ("Newberg May 15, 2006 Letter"), Ex. 28 to Rachman Decl.)  In response, the Copyright Office wrote that while the individual elements displayed on the site did not appear to be copyrightable artwork standing alone, the work "contains compilation authorship . . . [where the term] 'compilation' is defined as 'a work formed by the collection and assembling of preexisting material[s] . . . that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.'"  (Copyright Office Letter at 1.)  O'Keefe subsequently authorized the Copyright Office to amend his application to seek a copyright for a "compilation" rather than a "2-dimensional artwork."  (<u>Id.</u>; Newberg May 15, 2006 Letter at 1; Copyright Registration Certificate at 1.)  The amended application was granted.

REQUEST PLEASE!

Client Access:
http://tomokeefe.intranets.com

(Id. at 2.)

O'Keefe claims that in the early summer of 2003, shortly after the www.mycardmywork.com website was activated, he sent this email to individuals at large advertising agencies including Brian Collins, who was then the Executive Creative Director of defendant Ogilvy's Brand Integration Group, a department that concentrated on graphic design. (O'Keefe Decl. ¶ 30; Dep. of Brian Collins dated Sept. 18, 2007 ("Collins Dep.") at 31-32.) O'Keefe asserts that he "personalized" the email sent to Collins but does not specify how it differed from the generic template in the record. (O'Keefe Decl. ¶ 32.) Although O'Keefe has not presented a copy of the email allegedly sent to Collins or records showing that he transmitted any message whatsoever to Collins, he explains that he is unable to provide such evidence because his email server was "hacked," causing the loss of the relevant data. (Id.; see also Electronic Communication Exchange Between O'Keefe and iValueHost, LLC dated Feb. 15, 2005, Ex. 18 to O'Keefe Decl.) Instead, as documentary evidence of the emailing, O'Keefe proffers a list of contact information— including email addresses—for individuals at several advertising agencies in New York, including Brian Collins. (Ex. 14 to O'Keefe Decl.) O'Keefe also offers a printout of certain computer files that appear to show that the contact list has existed in its present form since the summer of 2003. (O'Keefe Decl. ¶ 30 & Ex. 15.) O'Keefe claims that in the summer of 2003, he emailed all of the persons on the contact list. (O'Keefe Decl. ¶ 30.) He testified that he did not receive a bounce-back email from Brian Collins and that "[a]s far as I know, [Collins] . . . reviewed my email." (O'Keefe Dep. at 187:20-22.)

O'Keefe asserts that he sent the email from the address "look@mycardmywork.com."

(Id.)[4]

For his part, Collins testified that he does not recall receiving any email from

O'Keefe in 2003 (Dep. of Brian Collins dated Sept. 18, 2007 at 149:3-10), that it was

uncommon for him to receive emails from people looking for work, and that he would

"pretty much automatically dismiss . . . [a]nything [he] thought was a mass mailing" (id. at

143:11-21, 144:18-45:2).  Collins testified that he would not have forwarded the email or

any of its contents to anyone else (id. at 145:25-46:11, 149:20-24, 168:13-71:2), and that

he had never visited the www.mycardmywork.com website (id. at 149:11-16).

Even if he had been exposed to O'Keefe's work, the parties dispute the extent to

which Collins would have been able to influence the development of Amex's "My Life.

My Card." advertising campaign.  According to defendants, the Brand Integration Group in

which Collins worked had little to do with creating the advertising campaign, which was

handled chiefly by other Ogilvy personnel in the New York office.  (Defs.' 56.1 ¶ 23.)  On

the other hand, O'Keefe points out that Brand Integration Group personnel who worked

directly with Collins also assisted in a "branding exercise" for Amex "to come up with

some kind of an icon that signs off the campaign."  (Dep. of Nancy Boyd dated Jun. 19,

2007 ("Boyd Dep.") at 37:24-38:11; see also Decl. of David Israel in Support of Defs.'

Mot. for Summary Judgment dated Jan. 12, 2008 ("Israel Decl.") ¶ 3; Email From John

---

[4] O'Keefe also claims that he sent a similar email to Carrie McGranahan of Ogilvy Public Relations.
(O'Keefe Decl. ¶ 31.)  However, he admits that Ogilvy Public Relations is a separate company from
defendant Ogilvy & Mather Worldwide, Inc. (id.; see also Decl. of Nancy Boyd in Support of Defs.' Mot. for
Summary Judgment dated Jan. 9, 2008 ("Boyd Decl.") ¶ 6), and undisputed evidence in the record indicates
that neither Ogilvy Public Relations nor McGranahan had any involvement with the development of the
allegedly infringing advertising campaign at issue in this litigation (Boyd Decl. ¶ 6).  O'Keefe also believes
that Rebecca Morrissey, an employee of a staffing agency, sent his resume and email address to defendant
Digitas in an attempt to find work for O'Keefe during the relevant timeframe (O'Keefe Dep. at 199:19-24),
but has provided no evidence to support his belief.

Seifert to Tony Wright dated May 19, 2004, Ex. 1 to Decl. of Brad Newberg in Opposition to Defs.' Mot. for Summary Judgment ("Second Newberg Decl.").)  Collins also had working relationships with many of the Ogilvy personnel who contributed to the creation of the advertising campaign.  (Collins Dep. at 88:13-90:24.)

     C.     <u>The American Express "My Life. My Card." Advertising Campaign</u>

     1.     *The Early Developmental Stages*

Around May 2004, nearly a year after O'Keefe allegedly sent the above-described email to Brian Collins, Amex engaged Ogilvy to develop an advertising campaign.  (Defs.' 56.1 ¶¶ 1-3; Pl.'s Counter 56.1 ¶¶ 1-3; Pl.'s 56.1 ¶ 38.)  Over the following two months, Ogilvy presented several proposals to Amex for approval.  (Defs.' 56.1 ¶ 4; Pl.'s 56.1 ¶ 4.)  Several "themes" for the campaign were being considered, such as "Do You Know Me," "How To," "Interesting Lives" and "Long Live Dreams."  (Id.)  "My Life. My Card." was not one of the themes presented to Amex during this period.  (Pl.'s 56.1 ¶¶ 40-41.)  Some of the ideas that were presented to Amex were rejected because they "didn't create the magic that everybody was looking for."  (Boyd Dep. at 60:11-61:6.)  As of mid-July 2004, Ogilvy's top contenders for the campaign theme were (1) an update of a campaign Amex had used many years prior called "Do You Know Me?" and (2) a new campaign called "How To."  (Pl.'s 56.1 ¶ 45; Defs.' Counter 56.1 at 12 ¶ 45.)

Unsatisfied with these options, John Hayes, the Chief Marketing Officer of Amex, asked Ogilvy to come up with a "challenger" campaign to "Do You Know Me?"  (Pl.'s 56.1 ¶ 48; Defs.' 56.1 ¶ 48; Email from Nancy Boyd to Chris Mitton et al. dated July 20, 2004, Ex. 33 to Decl. of Brad Newberg in Support of Pl.'s Mot. for Partial Summary Judgment ("First Newberg Decl.").)  Although the parties vigorously dispute whether it

was the product of independent creation or whether it was derived from O'Keefe's work, it is undisputed that the American Express "My Life. My Card." campaign was born shortly after Hayes' request.  (Defs.' 56.1 ¶¶ 6-11; Pl.'s Counter 56.1 ¶¶ 6-11.)

According to defendants, within the following weeks, Ogilvy's Chris Mitton, Tom Drymalski, and Jon Koffler invented the "My Life. My Card." tagline and campaign theme.  (Defs.' 56.1 ¶¶ 6-8.)  Mitton, Drymalski, and Koffler all deny that they had heard of O'Keefe or his business or that they had viewed his website at any time prior to the initiation of this lawsuit.  (Decl. of Chris Mitton in Support of Defs.' Mot. for Summary Judgment dated Jan. 10, 2008 ("Mitton Decl.") ¶ 11; Decl. of Thomas Drymalski in Support of Deft's' Mot. for Summary Judgment dated Jan. 8, 2008 ("Drymalski Decl.") ¶¶ 12, 15, 17; Decl. of Jonathan Koffler in Support of Defs.' Mot. for Summary Judgment dated Jan. 10, 2008 ("Koffler Decl.") ¶ 9.)  They also deny having had any contact with Brian Collins regarding the development of the advertising campaign.  (Id.)

After an initial brainstorming session, Drymalski and Koffler created several sample print advertisements (the "mock print ads") that were, according to Drymalski, "never intended to be used on final ads, but were just mock ups to allow people to see how the [My Life. My Card.] concept could work in print."  (Defs.' 56.1 ¶¶ 8-11; Pl.'s Counter 56.1 ¶¶ 8-11; Drymalski Decl. ¶ 10 & Ex. E.)  O'Keefe maintains that the mock print ads are similar to his own work on the www.mycardmywork.com website.  Each mock print ad is laid out on a horizontally aligned rectangle and features a celebrity's photograph.  (Ex. E to Drymalski Decl.)  Most of the ads also contain the handwritten words "My Life" and "My Card" as well as hand drawn arrows pointing from the words to graphic elements. (Id.)  Specifically, in most of the mock ads, an arrow points from "My Life" to a collage of

images that appear to be from the celebrity's personal life, and another arrow points from "My Card" to the American Express "blue box" logo and what appears to be the celebrity's signature.  (Id.)  Some of the graphic elements and images in the mock print ads appear to "bleed off the page."  (Id.)

The mock print ads and other sample advertisements were shown to Amex in August 2004.  (Pl.'s 56.1 ¶¶ 52-53; Defs.' Counter 56.1 at 12 ¶¶ 52-53.)  Amex was pleased with the presentation and the company authorized the "My Life. My Card." tagline and campaign, which was developed over the following months for release to the public beginning in November 2004.  (Pl.'s 56.1 ¶¶ 53, 55; Defs.' Counter 56.1 at 12 ¶¶ 53, 55.)  Amex hired Digitas, Inc. to develop websites as part of the campaign.  (Compl. ¶ 33; Ans. of Defendant Digitas, Inc. ¶ 33.)

Prior to the release of the final campaign, Amex retained a law firm to provide an opinion as to whether "My Life. My Card." was available as a mark.  (Defs.' 56.1 ¶ 19; Pl.'s Counter 56.1 ¶ 19.)  A search of public records and databases for various combinations of the words "my," "life," and "card" failed to return any reference to O'Keefe's work, and the firm advised Amex of its opinion that "My Life. My Card." was available for use and trademark registration.  (Defs.' 56.1 ¶ 20; Pl.'s Counter 56.1 ¶ 20.)

2.  *The Final Advertising Campaign*

The final campaign was comprised chiefly of print advertisements, billboards and other outdoor advertising, television ads, and an online component consisting mainly of a website located at www.mylifemycard.com.  (Pl.'s 56.1 ¶¶ 56-57; Defs.' Counter 56.1 at 12-13 ¶¶ 56-57; Decl. of Nancy Boyd dated Jan. 9 ("Boyd Decl.") ¶¶ 7-10 and Exs. B-E; Chase Decl. ¶ 6 and Ex. 1.)  Virtually all of the advertisements making up the final

campaign displayed the tagline "My Life. My Card." adjacent to the familiar American Express "blue box" logo and the signature of a celebrity.  (See Exs. B-E to Boyd Decl; Exib. 1 to Decl. of Oonie Chase in Support of Defs.' Mot. for Summary Judgment dated Jan. 9, 2008 ("Chase Decl.").)  In some instances the tagline was handwritten and in some instances it appeared in typeface.  (Id.)  Except for the online component, which was handled by defendant Digitas, Ogilvy developed the entire campaign.  (Decl. of Mark Beeching in Support of Defs.' Mot. for Summary Judgment dated Jan. 8, 2008 ("Beeching Decl.") ¶¶ 3-4.)  Although the mock print ads discussed above were not included in the final advertising campaign released to the public, they were transmitted to Digitas, where they were influential in the development of the www.mylifemycard.com website.  (Pl.'s 56.1 ¶¶ 59-61; Defs.' Counter 56.1 at 13 ¶¶ 59-61; Chase Decl. ¶¶ 4, 5; Beeching Decl. ¶ 6; Exs. 19 & 24 to First Newberg Decl.)

Amex stopped using the "My Life. My Card." advertising campaign and tagline in 2006.  (Boyd Decl. ¶ 3; Scotti Decl. ¶ 10.)  During the time the campaign was active, it was used as a "global branding campaign for all of Amex's [credit] card products and card-related services."  (Scotti Decl. ¶ 2.)  It is undisputed that O'Keefe's "My Card. My Work." business does not compete with Amex in the credit card or credit card services markets.

The parties dispute whether Amex also used "My Life. My Card." to promote a side business, run by a subsidiary of Amex called American Express Publishing Corporation ("Amex Publishing"), providing advertising and design services including website creation, allegedly in competition with O'Keefe.  (Decl. of Peter Oriol in Support of Defs.' Mot. for Summary Judgment dated Jan. 9, 2008 ("Oriol Decl.") ¶¶ 2-4; Ex. 25 to

Newberg Decl.; see also http://www.aepcustomsolutions.com, (last visited Nov. 24, 2008).)  According to defendants, the "My Life. My Card." campaign did not promote the services of Amex Publishing but was limited to Amex's core products—credit cards, other "payment products," and card-related services.  (Oriol Decl. ¶ 6; Decl. of John Hayes in Support of Defs.' Mot. for Summary Judgment dated Jan. 10, 2008 ("Hayes Decl.") ¶¶ 2-7; Dep. of Diego Scotti dated Jun. 28, 2007 at 10:25-13:3.)

O'Keefe, however, insists that the campaign also promoted Amex Publishing's services but provides no evidence in support of this belief.  None of the advertisements that constituted the "My Life. My Card." campaign mentioned Amex Publishing, (see Exs. B-E to Boyd Decl; Exib. 1 to Chase Decl), and the record contains no indication that the phrase "My Life. My Card." ever appeared on the Amex Publishing website or in any materials promoting Amex Publishing's services.

In support of his view, O'Keefe points to deposition testimony by John Hayes, Amex's Chief Marketing Officer, that the "My Life. My Card." campaign was "designed to support the [American Express] brand . . . wherever it might appear."  (Hayes Dep. at 32:10-12.)  From this, O'Keefe infers that because Amex Publishing shares the American Express "brand," the "My Life. My Card." campaign implicitly promoted Amex Publishing.  However, Hayes in fact testified that the "brand" he was referring to was the American Express "brand . . . for our consumer card business" (id. at 48:19-20; Hayes Decl. ¶¶ 3-5), which did not include the advertising services provided by Amex Publishing.  Contrary to O'Keefe's unsupported assertion, Hayes did not admit at his deposition that

the "My Life. My Card." campaign promoted Amex Publishing.[5]  Even if he had, O'Keefe

has not adduced any evidence that the "My Life. My Card." campaign was associated with

Amex Publishing in the minds of consumers.  To the contrary, none of the members of the

public who testified in this case had ever heard of Amex Publishing despite having been

exposed to the "My Life. My Card." tagline and campaign.  (See Burns Dep. at 94:12-14;

Galper Dep. at 124:5-7; Dep. of Shaun Guckian dated Oct. 1, 2007 ("Guckian Dep.") at

101:9-18; Mahoney Dep. at 109:23-25; Perkins Dep. at 54:24-55:1; Dep. of Francis Phan

dated Sept. 20, 2007 ("Phan Dep.") at 127:7-9.)

        O'Keefe also asserts that Amex's "My Life. My Card." campaign was copied in

large measure from his own work.  Yet of the components released to the public in the

final advertising campaign, O'Keefe specifically argues only that the

www.mylifemycard.com website contained content similar to his own.  (Pl.'s Opp. Mem.

at 10-16.)  O'Keefe does not identify, and the record does not reveal, any specific

similarities between his work and the balance of the advertising campaign.  For example,

many of the print advertisements released to the public consisted of a single photograph of

a celebrity along with the Amex logo, the celebrity's signature, and the words "My Life.

My Card."  (Boyd Decl. ¶ 8 and Ex. C.)  Those advertisements did not display hand-drawn

arrows linking text to graphic elements that bleed off the page or anything else that was

similar to plaintiff's work.  (Compare Ex. C to Boyd Decl. with Ex. 2 to O'Keefe Decl.)

Similarly, the television and outdoor advertisements shared none of the features of

---

[5] O'Keefe also points to similar "admissions" in the deposition testimony of Diego Scotti and Ogilvy's Tom
Drymalski.  (See Pl.'s 56.1 ¶ 63.)  When placed in context, their testimony simply does not support
O'Keefe's position.  (See Scotti Decl. ¶¶ 6-9; Scotti Dep. 11:6-13:3; Drymalski Decl. ¶¶ 6-8.)

plaintiff's work.  (<u>See generally</u> Exs. B & D to Boyd Decl.)[6]  The alleged similarities

between O'Keefe's work and the www.mylifemycard.com website are taken up below.

## II.    ANALYSIS

###    A.    <u>The Summary Judgment Standard</u>

Summary judgment is appropriate if the evidence shows that there is no genuine

issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(c); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.

Ed. 2d 265 (1986).  A genuine issue of material fact exists where the record taken as a

whole could lead a reasonable trier of fact to find for the non-moving party.  <u>Matsushita</u>

<u>Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d

538 (1986).  In determining whether a genuine issue of material fact exists, the Court "is to

resolve all ambiguities and draw all permissible factual inferences in favor of the party

against whom summary judgment is sought."  <u>Patterson v. County of Oneida</u>, 375 F.3d

206, 219 (2d Cir. 2004).  The non-moving party, however, "may not rely on mere

conclusory allegations or speculation, but instead must offer some hard evidence" in

support of its factual assertions.  <u>Id.</u> (quoting <u>D'Amico v. City of New York</u>, 132 F.3d 145,

149 (2d Cir. 1998)).

###    B.    <u>O'Keefe's Copyright Claim Fails Because He Cannot Demonstrate Actual</u>
<u>Copying</u>

In order to establish liability for copyright infringement, a plaintiff must show

(1) ownership of a valid copyright, (2) actual copying of the copyrighted work, and (3) that

---

[6] Certain advertisements released by Amex exclusively in Australia during the Australian Open tennis tournament incorporated hand drawn arrows linking text to graphic elements.  (<u>See</u> Ex. E to Boyd Decl.) O'Keefe does not specifically argue that these advertisements bear any resemblance to his own work. Indeed, aside from the use of hand drawn arrows and hand written text, the advertisements released in Australia do not share any features with O'Keefe's work.  (<u>Compare</u> <u>id.</u> <u>with</u> Ex. 2 to O'Keefe Decl.)

the copying amounts to an 'improper' or 'unlawful' appropriation . . . by demonstrating that substantial similarity to protected material exists between the two works." Laureyssens v. Idea Group, Inc., 964 F.2d 131, 139-40 (2d Cir. 1992) (quoting Arnstein v. Porter, 154 F.2d 464, 468 (2d Cir. 1946)).  Because no reasonable finder of fact could determine, based on the record in this action, that defendants actually copied plaintiff's work, summary judgment dismissing plaintiff's copyright claim is granted.[7]

Where, as here, a plaintiff has not adduced direct evidence that the defendant actually copied his work, indirect proof of copying may suffice to overcome summary judgment.  Laureyssens, 964 F.2d at 140.  A common form of indirect proof of copying "is a showing of defendant's opportunity to come into contact with plaintiff's work and such similarities between the works which, under all the circumstances, make independent creation unlikely."  Id. (quoting Latman, "Probative Similarity" as Proof of Copying: Toward Dispelling Some Myths in Copyright Infringement, 90 Colum. L. Rev. 1187, 1214 (1990)).  These two factors are often denominated "access" and "probative similarity."  In general, "[t]here is an inverse relationship between access and probative similarity such that the stronger the proof of similarity, the less the proof of access is required."  Jorgensen v. Epic/Sony Records, 351 F.3d 46, 56 (2d Cir. 2003) (internal citation and quotation marks omitted).  Indeed, where "the works in question are 'so strikingly similar as to

---

[7] The Court previously denied defendants' motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss O'Keefe's copyright claim at the pleading stage.  In so doing, the Court rejected defendants' contention that plaintiff had failed to adequately plead that any copying that may have occurred amounted to an unlawful appropriation because defendants' website contained substantial similarities to the protectable elements of plaintiff's website.  (Tr. of Oral Decision on Defs.' Mot. to Dismiss dated Apr. 11, 2007 at 7-10.)  In denying defendants' motion to dismiss the copyright claim, the Court addressed only the element of unlawful appropriation and not the distinct question of whether defendants actually copied plaintiff's work.  More importantly, the motion to dismiss was decided on a very limited record consisting only of the complaint and a few screen shots of some hand-picked pages from plaintiff's and defendants' websites.  Following discovery, the Court has now viewed the works in their entirety and has determined based on that viewing and a review of the record that no reasonable trier of fact could find that defendants actually copied plaintiff's work.

preclude the possibility of independent creation, copying may be proved without a[n affirmative] showing of access.'" Id. (quoting Lipton v. Nature Co., 71 F.3d 464, 471 (2d Cir. 1995)).  On the record in this case, no reasonable trier of fact could find that defendants actually copied plaintiff's work.

> 1.    *Plaintiff Has Failed to Demonstrate Access*

O'Keefe has failed to adduce evidence demonstrating that the persons responsible for creating defendants' work had access to his www.mycardmywork.com website.  "In order to support a claim of access, a plaintiff must offer 'significant, affirmative and probative evidence'" that an alleged infringer had a "'reasonable probability'—not simply a 'bare possibility'"—of being exposed to his work.  Jorgensen, 351 F.3d at 51 (quoting Scott v. Paramount Pictures Corp., 449 F. Supp. 518, 520 (D.D.C. 1978); Gaste v. Kaiserman, 863 F.2d 1061, 1066 (2d Cir. 1988)); see also Clonus Assocs., 457 F. Supp. 2d at 439.  "As proof of access, a plaintiff may show that (1) the infringed work has been widely disseminated or (2) a particular chain of events exists by which the defendants might have gained access to the work."  Tomasini v. Walt Disney Co., 84 F. Supp. 2d 516, 519 (S.D.N.Y. 2000) (internal citations and quotation marks omitted).

There is no dispute that O'Keefe's work was not "widely disseminated" within the meaning of the case law.  Indeed, the mere fact that O'Keefe's work was posted on the internet prior to the creation of defendants' work is insufficient by itself to demonstrate wide dissemination.  See Nicholls v. Tufenkian Import/Export Ventures, Inc., 367 F. Supp. 2d 514, 521 (S.D.N.Y. 2005); Hoch v. Mastercard Int'l, 284 F. Supp. 2d 1217, 1221 (S.D.N.Y. 2003).  O'Keefe instead posits a "particular chain of events" whereby defendants may have been exposed to his website—namely, that in June 2003 he attempted

to obtain employment by sending, unsolicited, an email containing a link to his website to Brian Collins at Ogilvy.  According to O'Keefe, Collins may have then opened the link and subsequently forwarded the website to those persons at Ogilvy who were responsible for creating the "My Life. My Card." campaign more than a year later.

In response, defendants point to Collins's testimony that he never received an email from O'Keefe and never visited his website or viewed any of his work.  Defendants also highlight the testimony of the Ogilvy personnel who were responsible for creating the Amex campaign.  They say that they had never heard of O'Keefe, visited his website, or been exposed to his work in any manner prior to the initiation of this lawsuit.  Further, defendants point to Collins's policy of refusing to review unsolicited emails from persons seeking employment with Ogilvy.  Defendants also point out that even if Collins had viewed the email, it did not actually include a copy of O'Keefe's work but only contained a link to the www.mycardmywork.com website and that even if Collins had followed the link, he would have been presented with a choice to avoid the main area of the site if he had "had it up to 'here' with these silly flash sites"—as the opening page of O'Keefe's website states—and wished to go directly to O'Keefe's resume.  Finally, defendants assert that the department in which Collins worked was not involved in the creation of the "My Life. My Card." advertising campaign and O'Keefe has presented no evidence whatsoever that Collins in fact forwarded O'Keefe's email or website to anyone at Ogilvy who did work on that campaign.

In the face of this evidence, O'Keefe proffers only his own testimony that he sent the summer 2003 mass email to Brian Collins and did not receive a "bounce back."  He infers from this not only that Collins received the email, but also that he read it and that he

then visited O'Keefe's website and in fact copied the website.  This is patently insufficient evidence to show a "'reasonable probability'—not simply a 'bare possibility'"—that defendants were exposed to O'Keefe's work.  <u>Jorgensen</u>, 351 F.3d at 51 (internal citation and quotation marks omitted).

Caselaw supports this conclusion.  For example, in <u>Tomasini v. Walt Disney Co.</u>, 84 F. Supp. 2d 516 (S.D.N.Y. 2000), a defendant maintained a policy of refusing to consider unsolicited submissions.  Given that the company's employees testified that they had never viewed Tomasini's unsolicited submission and the plaintiff "presented no evidence upon which a jury could . . . infer[] that the testimony . . . [was] not truthful," the court granted summary judgment dismissing Tomasini's copyright claim for insufficient proof of access.  84 F. Supp. 2d at 520 (S.D.N.Y. 2000) (internal citation quotation marks and alterations omitted).

Similarly, in <u>Novak v. National Broadcasting Co., et. al</u>, the court found proof of access insufficient to overcome summary judgment for NBC.  752 F. Supp. 164, 169-70 (S.D.N.Y. 1990).  In that case, the plaintiff had <u>hand</u> <u>delivered</u> a video tape of his work to NBC and the tape found its way into the office of Brandon Tartikoff, the President of NBC Entertainment, a division of NBC.  <u>Id.</u> at 167.   Tartikoff, however, testified that he did not view the work pursuant to a policy of ignoring unsolicited submissions.  <u>Id.</u> at 169.  In the face of Tartikoff's testimony and in the absence of any "affirmative evidence that Tartikoff viewed the tapes," the court found that plaintiff had not raised a genuine issue of fact as to NBC's access to his work.  <u>Id.</u>; <u>see also</u> <u>Dimmie v. Carey</u>, 88 F. Supp. 2d 142, 144, 148-49 (S.D.N.Y. 2000) (summary judgment was appropriate where the defendants denied reviewing plaintiff's work pursuant to a policy of refusing to review unsolicited

submissions and the plaintiff offered only conclusory allegations to the contrary).

The cases cited by O'Keefe are inapposite.  Price v. Fox Entertainment Group, Inc., No. 05 Civ. 5259, 2007 WL 241389 (S.D.N.Y. Jan. 26, 2007), for example, where summary judgment was denied to the defendant, is readily distinguishable.  In that case, a third party intermediary who was a "business friend[]" of the defendant had "undisputedly" reviewed the plaintiff's work.  Id. at *8.  In addition, the works in question contained numerous "notable similarities."  Id.  In contrast, in this case there is no evidence that Collins reviewed O'Keefe's work in contravention of his regular policy of ignoring unsolicited submissions.  Nor is there evidence that the uncontradicted and consistent testimony of Collins and the other Ogilvy and Digitas personnel involved in the campaign was untruthful.  Further, as explained below, the similarities between O'Keefe's work and the Amex advertising campaign are not substantial enough to raise an inference of copying.

The other cases cited by plaintiff are similarly distinguishable.  See, e.g., Gaste v. Kaiserman, 863 F.2d 1061 (2d Cir. 1988) (where the plaintiff introduced direct evidence that defense witnesses had testified untruthfully, a jury was entitled to reject the defense witnesses' claims of non-exposure to the plaintiff's work).  Summary judgment dismissing O'Keefe's copyright claim is appropriate because he has failed to demonstrate via "significant, affirmative and probative evidence" that defendants had a reasonable probability of being exposed to his work.  Jorgensen, 351 F.3d at 51 (internal citation and quotation marks omitted).

2.    *There Are No Probative Similarities Between the Subject Works*

Even if O'Keefe had demonstrated access to his work, his copyright claim would fail because the similarities between his work and defendants' are not probative of

copying.  "Similarities between works are 'probative of copying' if the 'similarities between the two works . . . would not be expected to arise if the works had been created independently.'"  Velez v. Sony Discos, No. 05 Civ. 0615, 2007 U.S. Dist. LEXIS 5495, at *20-21 (S.D.N.Y. Jan. 16, 2007) (quoting Odegard, Inc. v. Costikyan Classic Carpets, Inc., 963 F. Supp. 1328, 1337 (S.D.N.Y. 1997)).  Not all similarities between creative works are "probative similarities."  For example, "the fact that two songs are similar in the sense that they both use 4/4 time . . . is not . . . a probative similarity, because it is so commonplace that it is not unlikely to arise [in] independently created works."  Id. at *30-31.  Indeed, "[t]he less creative the choice, the stronger the inference that the same choice or group of choices made by another was made independently."  The Procter & Gamble Company v. Colgate-Palmolive Co., 199 F.3d 74, 78 (2d Cir. 1999).  As between any two creative works, similarities that are "the product of conventions in the field" do not tend to prove copying because they can be expected to arise in independently created works.  Id. at 77-78.

       A side-by-side comparison of plaintiff's and defendants' work reveals that the few similarities that exist are not probative of copying.  Plaintiff identifies the following similarities between his www.mycardmywork.com website and defendants' mock print ads and www.mylifemycard.com website:  (1) the phrase "My Card. My Work." is similar to the phrase "My Life. My Card."; (2) the phrases appear to be handwritten; (3) the phrases are linked to "real world objects (rather than drawn objects)" by what appear to be hand drawn arrows; (4) the objects bleed off the page; and (5) all of this occurs on a white horizontal rectangle.  (Pl.'s Opp. Mem. at 14.)  It is undisputed, however, that similar elements appear frequently in much print and internet advertising.  Even a cursory review

of the other advertisements presented to the Court leads inexorably to the conclusion that handwritten words linked by hand drawn arrows to "real world" objects that bleed off a white horizontal page are features so commonplace in the advertising field that they can be expected to arise, either alone or in combination, in independently created work.  (See, e.g., Ex. B to Mitton Decl.; Exs. 3-5 to Rachman Decl.)[8]  Further, undisputed evidence in the record shows that what plaintiff claims was copied from his website are mere stock design elements commonly used in advertising.  (Drymalski Decl. ¶ 16; Koffler Decl. ¶ 11; Mitton Decl. ¶ 10; Chase Decl. ¶ 8.)[9]

O'Keefe states that the fact that the subject works contain these similar elements "is so improbable as to . . . be unexpected as a matter of random circumstance generated by independent creation."  (Pl.'s Opp. Mem. at 14.)  This conclusory assertion does not carry the day.  It is hardly a matter of "random circumstance" that different individuals working in the advertising industry could be expected to independently create works incorporating elements that are undisputedly commonplace in that industry.  Moreover, there is little similarity between the overall look and feel of the subject works.  While plaintiff's site features items from his professional life such as his business card, resume, and samples of actual projects created for his clients, defendants' work presents images that are evocative of the private lives of various celebrities.  Defendants' website contains multi-layered pop-up screens that incorporate video, still images, and text.  The website further provides links

---

[8] Although the specific phrases "My Card. My Work." and "My Life. My Card" are not stock elements in the advertising field, the mere fact that plaintiff's and defendants' works both contain phrases of the form "My ___. My ___." does not demonstrate copying.

[9] Defendants have also proffered the expert testimony of marketing professor David Seal that O'Keefe's website is chiefly composed of stock elements commonly used in the advertising field.  (Ex. 7 to Rachman Decl.)  Plaintiff has moved to strike this evidence.  Because no reasonable juror could deem the similarities between plaintiff's and defendants' works to be probative of copying even in the absence of this expert testimony, the Court  need not consider plaintiff's objections and O'Keefe's motion to strike the expert report of David Seal is therefore dismissed as moot.

to external sites that are associated with the various celebrities featured as the heart of the campaign. All of these features and more are absent from O'Keefe's work. No reasonable juror could find similarities probative of copying either in the overall look and feel or the specific elements of the subject works.

Because O'Keefe has failed to demonstrate either access or probative similarities between the subject works, summary judgment dismissing his copyright claim is appropriate.

C.     O'Keefe's Trademark Infringement, False Designation of Origin, and Unfair Competition Claims Fail Because There Is No Likelihood of Confusion

O'Keefe also brings claims for trademark infringement, false designation of origin, and unfair competition against Amex for its use of the tagline "My Life. My Card," which O'Keefe believes is likely to be confused with "My Card. My Work." [10] Section 43(a) of the Lanham Act provides that any person who uses in commerce "any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action." 15 U.S.C. § 1125(a). This section protects unregistered trademarks from infringement. Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114 (2d Cir. 2006). Infringement claims are analyzed under a two-prong test that requires a plaintiff to demonstrate first that its mark is protectable and second that "the defendant's use of its own mark will likely cause confusion with plaintiff's mark." Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d

---

[10] O'Keefe's trademark infringement, false designation of origin, and unfair competition claims against defendants Ogilvy and Digitas were dismissed at the pleading stage on the ground that O'Keefe did not allege the "use in commerce" of "My Life. My Card." by those defendants. (Tr. of Oral Decision on Defs.' Mot. to Dismiss dated Apr. 11, 2007 at 16.)

1072, 1074 (2d Cir. 1993); Banff, Ltd. v. Federated Dep't Stores, Inc., 841 F.2d 486, 489
(2d Cir. 1988).  These elements apply equally to claims for false designation of origin and
unfair competition.  See Momentum Luggage & Leisure Bags v. Jansport, Inc., No. 00 Civ.
7909, 2001 U.S. Dist. LEXIS 10253, at *37 n.19 (S.D.N.Y. July 23, 2001) (collecting
cases).

   For the purposes of its motion for summary judgment, Amex concedes that
O'Keefe has demonstrated the first element by showing that "My Card. My Work." is a
protectable mark.  (Defs.' Mem. in Support of Defs.' Mot. for Summary Judgment ("Defs.'
S.J. Mem.") at 23 n.8.)  Therefore, the sole issue for decision is whether a reasonable
finder of fact could find that Amex's use of "My Life. My Card." was likely to cause
confusion.

   To establish a likelihood of confusion, a plaintiff must show that "numerous
ordinary prudent purchasers are likely to be misled or confused as to the source of the
product in question because of the entrance in the marketplace of defendant's mark."
Gruner + Jahr, 991 F.2d at 1077.  In addition, under the "reverse confusion" theory, a
claim will lie where a defendant that has greater exposure in the marketplace uses a mark
similar to plaintiff's that "cause[s plaintiff's] potential customers to assume that [the
defendant] was the source of [the plaintiff's] mark and thus believe that [the plaintiff] was
the infringer."  W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 571 (2d Cir. 1993).
"The reverse confusion theory protects the mark of a [senior] user from being
overwhelmed by a subsequent user, typically where the subsequent user is larger and better
known and consumers might conclude that the senior user is the infringer."  Mejia &
Assocs. Inc. v. IBM, 920 F. Supp. 540, 546 (S.D.N.Y. 1996).  "[T]he relevant confusion is

that which affects the purchasing and selling of the goods or services in question."

W.W.W. Pharm., 984 F.2d at 574 (internal quotation marks and citations omitted).  In

either case a plaintiff must demonstrate "'a probability of confusion, not a mere

possibility.'"  Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 383 (2d Cir. 2005)

(quoting Gruner + Jahr, 991 F.2d at 1077).  O'Keefe asserts a "reverse confusion" claim in

this case.

      To determine whether there is a likelihood of confusion, courts in the Second

Circuit apply the eight-factor Polaroid balancing test articulated by Judge Friendly in

Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492 (2d Cir. 1961).  Star Indus., 412 F.3d

at 384; see also W.W.W. Pharm., 984 F.2d at 572 (applying the Polaroid test to a reverse

confusion claim).  The Polaroid factors are: (1) the strength of plaintiff's mark; (2) the

degree of similarity between plaintiff's and defendant's marks; (3) the competitive

proximity in the marketplace of the products sold under the marks; (4) if the products are

not in close proximity, the likelihood that the plaintiff will nevertheless "bridge the gap"

by entering into defendant's market; (5) whether there has been actual confusion in the

marketplace; (6) defendant's good faith or lack thereof in adopting its mark; (7) the quality

of defendant's product; and (8) the sophistication of plaintiff's customers.  Time, Inc. v.

Petersen Publ'g Co., 173 F.3d 113, 117 (2d Cir. 1999); see also Polaroid Corp., 287 F.2d

492, 495 (2d Cir. 1961).  No single Polaroid factor is determinative and courts are not

limited to considering only those factors.  Louis Vuitton, 454 F.3d at 118.  The test should

be applied non-mechanically with an eye to the ultimate question of whether, on balance, a

likelihood of confusion exists.  W.W.W. Pharm., 984 F.2d at 572.

1.      *The* Polaroid *Factors*

a.      Strength of Plaintiff's Mark

"The strength, or distinctiveness, of a mark is its power to identify the source of a product." Time, Inc., 173 F.3d at 117.  A mark's strength has two components: its inherent distinctiveness and the distinctiveness it has acquired in the marketplace.  Strange Music, Inc. v. Strange Music, Inc. 326 F. Supp. 2d 481, 488 (S.D.N.Y. 2004) (internal citation and quotation marks omitted).

Inherent distinctiveness is traditionally determined by placing a mark within one of the following categories, arranged from weakest to strongest: generic,[11] descriptive, suggestive, or arbitrary or fanciful.  W.W.W. Pharm., 984 F.2d at 572.  The law provides greater protection to marks that are less descriptive/more arbitrary in part because "the arbitrariness of the mark in relation to [the goods sold under the mark] makes it unlikely that an unrelated merchant would select a similar mark for closely related goods." TCPIP Holding Co. v. Haar Comms. Inc., 244 F.3d 88, 100 (2d Cir. 2001).  Therefore, consumers confronted with products sold under similar arbitrary/non-descriptive marks are likely to assume that the products derive from the same source.  Id. at 100-101.  On the other hand, consumers confronted with products sold under similar descriptive marks are not likely to infer that the products are from the same source because vendors are apt to use similar terms to describe similar products.  Id. (noting that consumers are unlikely to assume that crunchy candy bars marketed under the descriptive marks "CRUNCHIES" and "CRUNCHY" derive from the same source because confectioners are likely to select "names that describe and vaunt the crunchy texture of their products")

---

[11] Generic marks merely state the type of product being sold and are not entitled to any protection.  Gruner + Jahr, 991 F.2d at 1075 (the term "automobile" as applied to the sale of automobiles is a generic mark).

In this case, O'Keefe markets his advertising and design services under the mark "My Card. My Work."  Amex concedes for the purposes of its motion for summary judgment that O'Keefe's mark is inherently distinctive (Defs.' S.J. Mot. at 24 n.9), and the Court agrees.  There is nothing in the phrase "My Card. My Work." that describes the services on offer (other than the purely source-identifying description of the work as O'Keefe's—as in "My Work").  Further, a consumer would be unlikely to think that an "unrelated merchant would select a similar mark [to promote] closely related goods."  Id. at 100.

In addition to inherent distinctiveness, courts take account of a mark's "acquired distinctiveness," if any.  Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 744 (2d Cir. 1998).  Acquired distinctiveness is a measure of "the extent to which the public has come to identify the mark with a particular product."  W.W.W. Pharm., 984 F.2d at 573. There is no evidence that the public has come to identify "My Card. My Work." with O'Keefe's services to any appreciable degree.  Therefore, plaintiff's mark has little acquired strength or distinctiveness.

Indeed, O'Keefe concedes as much (Pl.'s Mem. in Support of Pl.'s Mot. for Partial Summary Judgment ("Pl.'s S.J. Mem.") at 17), but argues that the weakness of his mark in the marketplace actually supports his claim of reverse trademark confusion.  The Court agrees.  A reverse confusion claim such as O'Keefe's rests on a theory that the defendant has saturated the marketplace with a mark similar to the plaintiff's less well known mark to such a degree that consumers will be misled into believing that the plaintiff is "an unauthorized infringer" of the defendant's mark.  Banff, Ltd., 841 F.2d at 490.  Obviously, a well known mark—one that has a high degree of acquired distinctiveness—is less

susceptible to this sort of confusion than a mark that is not widely recognized.  In the reverse confusion context, therefore, the "commercial weakness" of O'Keefe's mark supports, rather than undermines, his claim.  See First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l Inc., No. 03 Civ. 707, 2004 WL 1575396, at *12 (S.D.N.Y. Jul. 15, 2004); see also Strange Music, 326 F. Supp. 2d at 488, 490; A & H Sportswear v. Victoria's Secret Stores, 237 F.3d 198, 231 (3d Cir. 2000) ("[I]n a reverse confusion claim, a plaintiff with a commercially weak mark is more likely to prevail than a plaintiff with a stronger mark, and this is particularly true when the plaintiff's weaker mark is pitted against a defendant with a far stronger mark.").  The inherent strength of O'Keefe's mark coupled with its relative weakness in the marketplace weighs in his favor.

b.      Similarity of the Marks

"In assessing the similarity [of plaintiff's and defendant's marks], courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." Gruner + Jahr, 991 F.2d at 1078; see also Lang v. Retirement Living Pub. Co., 949 F.2d 576, 581 (2d Cir. 1991); Jim Beam Brands Co. v. Beamish & Crawford, Ltd., 937 F.2d 729, 735 (2d Cir. 1991).  Although a side-by-side comparison of the two marks is "a useful heuristic means of investigating similarities and differences," it is error to overemphasize this approach.  Louis Vuitton, 454 F.3d at 117.  Rather, a court must analyze how the marks are viewed in the context of the marketplace, maintaining focus on the ultimate issue of the likelihood of consumer confusion.  Id.

It cannot be gainsaid that there are some similarities between "My Card. My Work." and "My Life. My Card." when viewed side-by-side in isolation.  Specifically, the

28

marks share a similar structure, read with a similar cadence, and have several words in common.  Although these are relevant considerations, they are not dispositive.  See e.g., W.W.W. Pharm. 984 F.2d at 573 (two marks that used the same words and sounded the same when spoken were nevertheless dissimilar given differences in their presentation).

Giving due attention to the entire context, it is apparent that the marks are not confusingly similar.  First, the marks were presented to the public using dissimilar modes of presentation.  Except for the web portion of the final advertising campaign, only a few of the Amex advertisements presented the words "My Life. My Card." in an animated script next to hand drawn arrows pointing to graphic elements.  O'Keefe of course presented the words "My Card. My Work." in this fashion on his website.  Even with respect to the web portion of the campaign, the celebrity focus of the Amex ads as well as the numerous differences between the parties' work described above make confusion unlikely.  Further, the products sold under the parties' marks (credit cards and related services on the one hand and advertising and design services on the other) differ dramatically.  The Second Circuit has held that such differences "lessen[] the chance that consumers will believe [plaintiff's] product originated with [defendant.]"  W.W.W. Pharm., 984 F.2d at 573.

Finally, and most importantly, it is undisputed that the Amex mark consistently appeared in immediate conjunction with the familiar American Express "blue box" logo.  The Second Circuit has "repeatedly found that the presence of a distinct brand name . . . weigh[s] against a finding of confusing similarity."  Playtex Prods., Inc. v. Georgia-Pacific Corp., 390 F.3d 158, 164 (2d Cir. 2004); see also Star Indus., 412 F.3d at 386; W.W.W. Pharm., 984 F.2d at 573 ("[W]hen a similar mark is used in conjunction with a company

name, the likelihood of confusion may be lessened.").  Given that the well known

American Express brand name and logo was consistently presented alongside the "My

Life. My Card." mark as well as the other differences in presentation noted above, the

marks cannot be deemed confusingly similar.  See Mejia, 920 F. Supp. at 547 (finding two

identically worded marks to be dissimilar because of the defendant's presentation of the

mark in conjunction with the well known "IBM" brand).

c.      Competitive Proximity of the Parties' Products

Under this factor, courts are concerned with whether the products or services sold

under the parties' marks compete with one another.  W.W.W. Pharm., 984 F.2d at 573.

The Second Circuit has explained that "ordinarily, little confusion will result when the

junior use [of a similar mark] is in an area of commerce that is outside the senior owner's

area."  TCPIP Holding Co., 244 F.3d at 95.  "Relevant considerations include the extent to

which the goods or services fall within the same class or are used together, as well as any

difference in content, purpose, geographic distribution, market position and audience

appeal."  Mejia, 920 F. Supp. at 548.  "The question is whether the parties offer their

products to the same market audience."  Id.

In this case, no reasonable trier of fact could find that the products sold under the

parties' marks were in competitive proximity.  Amex sold credit cards and related services

under the "My Life. My Card." mark and O'Keefe sold advertising and design services

under the "My Card. My Work." mark.  O'Keefe insists, contrary to the record, that Amex

actually used the "My Life. My Card." mark to promote the advertising and design

services offered by Amex Publishing.  His sole support for this position is the supposed

admission by Amex personnel that the "My Life. My Card." campaign was a "brand

30

campaign" which covered Amex Publishing's advertising and design services.  As discussed above, this position has no support in the record.

Citing Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254 (2d Cir. 1987), O'Keefe next argues that because Amex is a large diversified company that has a subsidiary that competes with O'Keefe in the advertising and design field (i.e., Amex Publishing), the fact that Amex used the "My Life. My Card." mark to promote its credit card business is sufficient to demonstrate likely confusion in the marketplace for advertising and design services.  This argument is unpersuasive.

In Mobil Oil, the Second Circuit affirmed a finding of competitive proximity where the plaintiff and the defendant both used their "great[ly] similar[]" marks in the "petroleum industry" but not in the sub-field of "oil trading."  818 F.2d at 257-58.  Even though plaintiff Mobil Oil had not previously used its famous "flying horse" trademark in the oil trading field, the defendant was not entitled to use a similar mark in that field because Mobil Oil had used the flying horse in numerous other areas within the petroleum industry.  Id. at 255-56, 57-58.  Under those circumstances, a consumer in the oil trading sub-field of the petroleum industry would likely believe that Mobil Oil was the source of products sold under the defendant's confusingly similar trademark.  Id. at 258.

This case is very different.  It cannot plausibly be said that the parties here used their marks in the same "industry" or in any fields that are even remotely related.  O'Keefe used his mark to sell advertising and design services.  Amex used its mark to sell credit cards and related services.  There is no reason to believe that a consumer in the market for advertising and design services would associate Amex's "My Life. My Card." mark with Amex Publishing.  Therefore, no reasonable juror could find that the products sold under

the parties' marks were in competitive proximity.[12]

### d.      Bridging the Gap

Even where there is no competitive proximity between the parties' products, a plaintiff may nevertheless demonstrate confusion if he is likely to "bridge the gap" by entering the defendant's market in the future.  W.W.W. Pharm., 984 F.2d at 574.  In addition, if "consumers . . . perceive the [plaintiff] as likely to do so," this factor weighs in plaintiff's favor.  Star Indus., 412 F.3d at 387.  O'Keefe does not contend and there is no evidence that he is likely to enter Amex's market by selling credit cards and related services at any time in the future, nor is there evidence that consumers believe he is likely to do so.  This factor thus weighs in Amex's favor.

### e.      Actual Confusion

A plaintiff must demonstrate "'a probability of confusion, not a mere possibility,'" Star Indus., 415 F.3d at 383, affecting "numerous ordinary prudent purchasers," Gruner + Jahr, 991 F.2d at 1077.  "De minimis evidence of actual confusion does not establish the existence of a genuine issue of material fact regarding the likelihood of confusion."  Nora Bevs., Inc. v. Perrier Group of Am., 269 F.3d 114, 124 (2d Cir. 2001) (quoting Universal Money Ctrs., Inc. v. AT & T, 22 F.3d 1527, 1535 (10th Cir. 1994)).

In many cases, confusion may be demonstrated by statistical survey evidence

---

[12] O'Keefe also argues that Amex is judicially estopped from arguing that it did not use "My Life. My Card." to sell advertising services because Amex previously sought to register "My Life. My Card." with the United States Patent and Trademark Office ("USPTO") in International Class 35, which covers the field of advertising and business services.  This argument is bootless.  "The doctrine of judicial estoppel prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding."  Troll Co. v. Uneeda Doll Co., 483 F.3d 150, 155 n.7 (2d Cir. 2007).  There is nothing inconsistent about seeking approval from the USPTO to use a trademark in a certain field on the one hand and maintaining as a matter of fact that the trademark was never used in that field.  Further, even if Amex's position before the USPTO was somehow inconsistent with its position now, there is no evidence that Amex "successfully advanced" its prior position—in other words, there is no evidence that the USPTO "adopted [Amex's] position in some manner."  Id.  To the contrary, O'Keefe has asserted that the USPTO rejected Amex's attempt to register "My Life. My Card." as a trademark.  (Pl.'s 56.1 ¶ 77.)

showing that actual consumers were confused by the entrance of defendant's mark in the marketplace.  While such evidence is not absolutely required, The Sports Authority, Inc. v. Prime Hospitality Corp., 89 F.3d 955, 964 (2d Cir. 1996), "[t]he lack of survey evidence counts against finding actual confusion." Merriam-Webster, Inc. v. Random House, Inc., 35 F.3d 65, 72 (2d Cir. 1994); see also Star Indus., 412 F.3d at 388; Nora Beverages, 269 F.3d at 124; The Sports Authority, Inc., 89 F.3d at 964 ("[T]he absence of surveys is evidence that actual confusion cannot be shown."); Essence Commc'n, Inc. v. Singh Indus., Inc., 703 F. Supp. 261, 269 (S.D.N.Y. 1988).

In this case, O'Keefe has failed to submit survey evidence of actual confusion in the marketplace, choosing instead to rely on eight anecdotal instances of what he claims was consumer confusion caused by Amex's use of its mark.  Specifically, O'Keefe adduced testimony from several colleagues and customers who stated that upon first viewing the works in question they mistakenly believed either that O'Keefe was involved in creating the Amex "My Life. My Card." tagline and campaign, or conversely, that O'Keefe copied the Amex tagline and campaign.  (Burns Dep. at 61-62; Decl. of David Galper dated Aug. 22, 2007 ¶ 7; Perkins Dep. at 13; Mahoney Dep. at 97-99; Cantlon Dep. at 169-74; Phan Dep. at 110-15; Deposition of Andrew Kidd dated Sept. 14, 2007 ("Kidd Dep.") at 106-11; Guckian Dep. at 56-57.)  However, because "the relevant confusion is that which affects the purchasing and selling of the goods or services in question," to be evidence of actual confusion in the marketplace, the testimony must indicate that the "confusion affected [the potential customer's] determination to purchase [plaintiff's] product."  W.W.W. Pharm., 984 F.2d at 574; see also Tr. of Columbia Univ. v. Columbia/HCA Healthcare Corp., 964 F. Supp. 733, 746-47 (S.D.N.Y. 1997) ("[T]here is

a difference between isolated expressions of momentary confusion and confusion that leads to actual purchasing decisions.").

Here, only <u>one</u> of the persons O'Keefe claims was "actually confused" based his purchasing decision in part on his confusion regarding the provenance of the parties' respective marks.  (Guckian Dep. at 103-104; Decl. of Shaun Guckian dated Jan. 14, 2008 ¶¶ 8-9.)  This evidence is de minimis and "does not go far toward demonstrating that an '<u>appreciable</u> number of ordinarily prudent purchasers' are likely to be confused.'"  <u>Mejia</u>, 920 F. Supp. at 551 (quoting <u>Universal City Studios, Inc. v. Nintendo Co.</u>, 746 F.2d 112, 115 (2d Cir. 1984)).  As O'Keefe has failed to demonstrate actual confusion to any appreciable degree, this factor does not weigh in his favor.  <u>See</u> <u>Universal City Studios</u>, 746 F.2d at 118 ("[T]he fact that there may be a few confused consumers does not create a sufficiently disputed issue of fact regarding the likelihood of confusion so as to make summary judgment improper.").

       f.        Bad Faith

Under <u>Polaroid</u>, evidence that a defendant adopted its mark in bad faith is relevant to whether consumers are likely to be confused.  <u>W.W.W. Pharm.</u>, 984 F.2d at 575.  To show bad faith, a plaintiff must demonstrate that the "defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product."  <u>Id.</u>  Conversely, evidence that "defendant . . . has requested a trademark search or has relied on the advice of counsel" tends to show good faith.  <u>Id.</u>

In this case, it is undisputed that Amex's attorneys performed a trademark search that did not return any reference to O'Keefe's mark and advised Amex that "My Life. My

34

Card." was available for use and trademark registration.  O'Keefe asserts that the

trademark search was "inadequate" and that Amex's failure to conduct a more thorough

search demonstrates its bad faith in adopting the mark.  Assuming solely for the sake of

argument that Amex's trademark search was somehow inadequate, O'Keefe has not

demonstrated bad faith.  The Second Circuit "has never held adoption of a mark with no

knowledge of a prior similar mark to be in bad faith even in the total absence of a

trademark search, much less on the basis of an allegedly flawed trademark search."  Star

Indus., 412 F.3d at 388.  In this case, there is no evidence that Amex had knowledge of or

intentionally copied O'Keefe's mark.  Therefore, even if Amex's trademark search was

somehow inadequate, a finding of bad faith would not follow.[13]

O'Keefe also points out that he sent a "cease and desist letter" to Amex in 2006

outlining his view that the "My Life. My Card." tagline infringed on his mark but Amex

did not cease using the mark.  O'Keefe argues that Amex's failure to adjust its behavior in

the face of his cease and desist letter demonstrates bad faith.  But a defendant's refusal to

abandon a mark in the face of a cease and desist letter cannot demonstrate bad faith

standing alone.  If a defendant reasonably believes its mark does not infringe plaintiff's,

she does not act  "with the [requisite] intention of capitalizing on plaintiff's reputation and

goodwill."  W.W.W. Pharm., 984 F.2d at 575; see also Strange Music, 326 F. Supp. 2d at

494 ("Evidence of a failure to discontinue [use after a cease and desist letter] does not per

se establish defendants' bad faith . . . '[A d]efenant['s] persistence . . . after notice proves

little or nothing against [him].'" (quoting Straus v. Notaseme Hosiery Co., 240 U.S. 179,

---

[13] O'Keefe asserts that defendant Ogilvy had knowledge of and intentionally copied his mark after Brian
Collins received the email containing a link to O'Keefe's website in the summer of 2003.  O'Keefe asserts
that Amex, as an Ogilvy principal, should be charged with Ogilvy's alleged knowledge.  However, as
explained above, on the record in this case, no reasonable juror could determine that Ogilvy had access to
O'Keefe's work.

181-82 (1916)).  Because O'Keefe has failed to adduce any evidence of bad faith, this

factor weighs in Amex's favor.

g.      The Quality of Amex's Products

"If an infringing product is of inferior quality, the senior user is entitled to protect

the good reputation associated with his mark from the possibility of being tarnished by

inferior merchandise of the junior user."  W.W.W. Pharm., 984 F.2d at 575.  There is no

evidence that Amex sells inferior products.  O'Keefe contends that his products are of high

quality and cites Morningside Group, Ltd. v. Morningside Capital Group L.L.C., 182 F.3d

133, 142 (2d Cir. 1999), for the proposition that the likelihood of confusion is increased

where a plaintiff's and a defendant's products are of equal quality.  O'Keefe misreads

Morningside Group.  That case stands for the proposition that where the products sold by a

plaintiff and a defendant are in close competitive proximity, the fact that they are also of

similar quality may "bring[] them into even closer proximity" in the minds of consumers.

182 F.3d at 142.  In this case, there is no competitive proximity between O'Keefe's

advertising and design services on the one hand and Amex's credit card and related

services on the other.  Therefore, regardless of whether O'Keefe's products are of equal

quality to Amex's, this factor favors neither party.

h.      Sophistication of Plaintiff's Customers

O'Keefe defines his customer base as "those people and businesses in the market

for various forms of advertising, branding and design services" and concedes that they are

generally sophisticated consumers.  (Pl.'s S.J. Mem. at 32.)  As such they are less prone to

confusion.  W.W.W. Pharm., 984 F.2d at 576.  Although it is true that "when . . . there is a

high degree of similarity between the parties' services and marks, the sophistication of the

36

buyers cannot be relied on to prevent confusion," Morningside Group, 182 F.3d at 143, there is no similarity between the parties services or marks in this case.  This factor weighs in Amex's favor.

> 2.    Polaroid *Balancing*

In this case, a reasonable finder of fact could determine only that O'Keefe has established one of the Polaroid factors—that his mark is strong.  There is no genuine dispute that the parties' marks are not confusingly similar when placed in the proper context, that the products sold under the marks are not in competitive proximity, that O'Keefe is unlikely to bridge the gap, that O'Keefe's evidence of actual confusion is de minimis, that Amex acted in good faith, that Amex's products are not inferior, or that O'Keefe's customers are sophisticated.  On balance, therefore, no reasonable trier of fact could find a likelihood of confusion on this record.  Accordingly, summary judgment dismissing O'Keefe's trademark infringement, false designation of origin, and unfair competition claims is appropriate.

> D.    O'Keefe's Breach of Implied Contract Claim Fails

Finally, O'Keefe asserts a claim for breach of implied contract under New York law.  This cause of action is predicated on the claim that Ogilvy personnel were exposed to the work and ideas contained on O'Keefe's website and impliedly promised to pay O'Keefe when they adopted his work and ideas.  Summary judgment dismissing this claim is appropriate because, as demonstrated above, no reasonable juror could conclude that Ogilvy personnel were exposed to or adopted O'Keefe's work.

## III.    CONCLUSION

For the reasons set forth above, defendants' motions for summary judgment

dismissing plaintiff's remaining claims [73 & 75] are granted. For the same reasons, plaintiff's motion for partial summary judgment [60] is denied. Plaintiff's motion to set aside Magistrate Judge Maas's January 2, 2008 discovery order [67] is dismissed as moot. Plaintiff's motion to strike the expert report and testimony of David Seal [70] is dismissed as moot. The Clerk of Court is directed to enter judgment in defendants' favor.

Dated: New York, New York
      December 4, 2008

SO ORDERED:

Sidney H. Stein, U.S.D.J.